IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LEANORE M. TAYLOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-745-SLR |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

Angela Pinto Ross, Esquire, of Doroshow, Pasquale, Krawitz &
Bhaya, Wilmington, Delaware.  Counsel for Plaintiff.

Colm F. Connolly, United States Attorney, and David F. Chermol,
Special Assistant United States Attorney, United States
Attorney's Office, Wilmington, Delaware.  Joyce M.J. Gordon,
Special Assistant United States Attorney, Social Security
Administration, Philadelphia, Pennsylvania.  Counsel for
Defendant.  Of Counsel:  Donna Calvert, Regional Chief Counsel,
and Robert S. Drum, Assistant Regional Counsel, Social Security
Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated:  February 𝒜 , 2007
Wilmington, Delaware

**ROBINSON, Chief J.**

## I.  INTRODUCTION

Plaintiff Leanore M. Taylor ("plaintiff") filed this action against defendant Jo Anne B. Barnhart, Commissioner of Social Security ("defendant"), on October 24, 2005.  (D.I. 1)  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of defendant denying her claim for disability income benefits under § 216(I) of the Social Security Act.  (Id.) Currently before the court are the parties' cross motions for summary judgment.  (D.I. 7, 9)  For the reasons stated below, the court will grant defendant's motion (D.I. 9) and deny plaintiff's motion (D.I. 7).

## II.  BACKGROUND

### A.  Procedural Background

On October 6, 2003, plaintiff filed an application for disability insurance benefits claiming disability since June 4, 2003.  (D.I. 5 at 67)  Plaintiff claimed pinched nerves in her low back, herniated discs in her upper back, low back pain, and residuals from failed anal fistula surgeries including unpredictable bowel movements, burning of skin and pain.  (Id.) The claim was denied initially and upon review because it was determined that her ailments were not severe enough to keep plaintiff from working.  (Id. at 53-57)  Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Id. at 58) The hearing was held on November 3, 2004.  (Id. at 25)  On

December 16, 2004, the ALJ denied plaintiff's claim.  (Id. at 23)

The ALJ found that plaintiff's anal fistula and hearing loss are

not severe impairments.  (D.I. 5 at 20)   The ALJ's additional

findings were as follows:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
3. The claimant's degenerative disc disease is a "severe" impairment, based on the requirements in the Regulations 20 C.F.R. § 404.1520©.
4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
6. The claimant has the residual functional capacity to perform light or sedentary work with the following additional limitations:  sit/stand option to permit changing positions every 30 minutes, no temperature extremes, and ready access to bathroom.
7. The claimant's past relevant work as a court clerk or a customer service representative did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565).
8. The claimant's medically determinable degenerative disc disease does not prevent the claimant from performing her past relevant work.
9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 404.1520(f)).

(Id. at 23)  On August 31, 2005, the Appeals Council declined to

review the ALJ's decision and his decision became the final

decision of the Commissioner.  (Id. at 7-9)

### B.  Plaintiff's Written Submissions to SSA

2

On October 6, 2003, plaintiff submitted an application for Disability Insurance Benefits in which she indicated that she had been unable to work since June 4, 2003 because of her disabling condition. (Id. at 67)  Also on October 6, 2003, plaintiff submitted an Adult Disability Report in which she claimed that, as a result of back pain, numbness in her left leg, limited standing and walking, and pain and leakage related to her anal fistula,[1] she could not work.  (Id. at 77)

On December 6, 2003, plaintiff completed a Disability Determination Services Daily Activities Questionnaire.  (Id. at 105-117)  In that questionnaire, plaintiff described her daily activities.

Plaintiff completes daily housework such as cooking, dusting, and laundry, and occasionally vacuums her carpets. (105)  She needs assistance with heavy pans, taking laundry out of the dryer, and sometimes vacuuming.  (Id. at 105-06) Plaintiff has difficulty getting up after cleaning her bathtub or washing the floor, and can not clean the bathtub walls, kitchen cabinets, or move furniture around.  (Id. at 105-06, 110)

Plaintiff states that she does not make her bed anymore and goes shopping about once per month.  (Id. at 105)  She has admittedly "cut way back" on cooking, as she has started cooking

---

[1]An anal fistula is an abnormal tubelike passage from a normal cavity or tube to a free surface or to another cavity such as the anus.  (D.I. 7 at 5, n.4) (citation omitted)

3

"short quick meals" to avoid standing for long periods of time at the stove. (Id. at 107)  Plaintiff also states that she sometimes has trouble sleeping. (Id. at 110)  She does not need any help with personal care such as grooming, dressing, or bathing. (Id.)  Plaintiff is able to do errands such as going to the post office and can drive a car. (Id. at 105)  She only takes short car trips, which has limited her ability to visit family. (Id. at 107)  According to plaintiff, she is "limited to short car rides occasionally - walks in [the] mall or local stores or around my house.  Shopping is really limited because I have to have someone with me to help with packages." (Id. at 109)

Outside of the house, plaintiff walks and plays with her dogs. (Id. at 106)  She completes yard work such as lawn care where possible. (Id. at 105-06)  She can not enjoy her favorite pasttime of fishing with her husband because she cannot cast out the reel or pick up fishing gear. (Id. at 107)  Plaintiff spends her free time reading books, playing with her dogs and watching television. (Id. at 108)

Plaintiff stated that "it is very difficult to control bowel movements and with this [fistula] opening there is no control at all.  And with back problem it is difficult keeping [the] incision area clean." (Id. at 111)  She worked through several operations for the anal fistula, however, bowel control became

4

more difficult with each surgery.  (Id.)  Plaintiff did not
require help to complete the Daily Activities Questionnaire.
(111)

Plaintiff also completed a Pain Questionnaire on December 6,
2003.  (Id. at 113)  On that questionnaire, plaintiff indicated
the she has pain in her lower back and left leg, present 80-100%
of the time.  (Id.)  Plaintiff indicated that movement, standing,
coughing and sneezing increase her pain, and that she spends
three to six hours per day lying or sitting down to relieve pain.
(Id. at 114)

## C. Facts Evidenced at the Administrative Law Hearing

Plaintiff is a 63 year old female who is five feet five
inches tall and weighs about two hundred pounds.[2]  (Id. at 651)
Plaintiff lives in a ranch-style house with her husband, who is
on disability from work due to strokes.  (Id. at 652)  Plaintiff
has a license and drives an automobile "quite often" to doctors,
stores, and laboratories in her local area due to her husband's
condition.  (Id.)

Plaintiff graduated from high school, completed one year at
college, and is a veteran of the United States Marine Corps,
where she served as a secretary to the psychiatric unit at Paris

_____

[2]Plaintiff stated on November 3, 2004 that her usual weight
is around 150 to 160 pounds, and that her weight increased due to
decreased mobility.  (D.I. 5 at 651)  Plaintiff indicated on her
Adult Disability Report that she weighed 190 pounds on October 6,
2003.  (Id. at 76)

5

Island and as a secretary at Headquarters Battalion. (Id. at 652-53) Plaintiff worked most recently for about 7 years for the State of Delaware as a court clerk for J.P. Court 13. (Id. at 653) Prior to this position, plaintiff worked for Discover Card, Wachovia Bank, and Chase Manhattan Bank as a customer service representative. (Id. at 653-54) While at Wachovia, plaintiff states that she moved from customer service to the encoding department when she "found out that [she] had lost more than half of the hearing in [her] right ear" in addition to being totally deaf in her left ear. (Id.) Plaintiff worked consistently prior to May of 2003. (Id. at 654)

Plaintiff testified about problems with, and treatment and medications related to, her back and left leg. Plaintiff stated that she has pain in her lower back halfway up to her waist, at which point the pain "gets very severe." (Id.) Plaintiff stated that her back pain is present "all the time," and can be worsened if she attempts to do physical activities such as mopping. (Id. at 654-55) Plaintiff also stated that she occasionally gets a burning pain in her left leg above her knee, which causes her to have to sit down. (Id. at 655)

Plaintiff testified that she treated with Dr. Delport and Dr. DeVotta for her back pain. (Id. at 655-56) Both doctors

6

have treated plaintiff's back pain with injections.[3]  (Id. at
656)  Plaintiff also testified that she broke her foot stepping
out of bed in 2004, and gets sharp pains in it "every so often."
(Id. at 657)  Plaintiff confirmed that she had a motor vehicle
accident in 2000 in which she was injured, and plaintiff received
compensation for those injuries in 2003.  (Id. at 666-67)

       The ALJ questioned plaintiff's testimony regarding the
deafness in her right ear and loss of more than half of her
hearing in the left ear, as plaintiff "seem[ed] to do pretty good
here today."  (Id. at 657, 655)  In response, plaintiff stated
that "[t]here's no background noise, and there's not a lot of
people talking.  That definitely interferes with me, and as long
as I'm looking at you, it's much better to hear you."  (Id. at
655)

       Regarding the fistula, plaintiff testified that she has
undergone six surgeries to close an opening between her
intestines and her vagina, which have been unsuccessful.  (Id. at
658)  Plaintiff waits four hours in the morning to make sure that
she does not have to go to the bathroom, as anytime she has a
bowel movement "it goes right over that [fistula] opening."  (Id.
at 657)  Should plaintiff eat something disagreeable, she will
get diarrhea, which burns her skin "all around [the fistula]

_____

       [3]Plaintiff also testified that Dr. Delport treated a pinched
nerve in her neck with injections that was caused during one of
her fistula surgeries.  (D.I. 5 at 656-57)

until it's bleeding." (Id. at 659) Plaintiff described the pain caused by her fistula as "very severe." (Id.)

Plaintiff stated that, as the result of her fistula, "[t]he last two years that I worked were terrible." (Id.) Plaintiff further testified:

> I took clothes if I needed to change clothes. I always wind [sic] up getting sick before I left the house, because I was such a nervous wreck that I wouldn't make it to work on time if I had a bowel movement or something like that. So the last 2 years were really, really hard.

(Id.) Plaintiff has not attempted to look for part time work because she "wouldn't want to get fired" due to absenteeism related to her condition as well as taking her husband to his doctor's appointments. (Id. at 660)

Plaintiff testified that she has difficulty walking, standing, sitting for periods of time, and lifting.[4] (Id. at 661-62) Plaintiff also stated that she can walk "maybe a couple of blocks" before experiencing "very severe" leg pain, can sit for "about an hour," and can "lift a gallon of milk with two hands," but "can't hold [her] arms up very long" when reaching for objects. (Id. at 661-62) Plaintiff attributes her difficulty reaching for objects with her left arm to the pinched

---

[4]Plaintiff stated that she "ha[s] to be careful in the shower, because sometimes just simply standing in the shower [her] leg will go numb." (D.I. 5 at 663) She can complete chores such as "a little bit of vacuum cleaning" and cooking "simple meals," but can not clean most of the bathroom or pull weeds outside. (Id. at 662-63)

nerve in her neck.  (Id. at 665-66)

In a given month, plaintiff claims that "more than half [of the days are] good days," which "is when [she] can still move around first thing in the morning as soon as [she] get[s] up," and, still not eating or drinking for several hours, can "go out and take a walk around the block or something like that."[5]  (Id. at 664)  On plaintiff's "bad days," "the fistula causes [her] problems and [her] skin's all irritated or bleeding, and [she] can't get out for a walk," and she is "usually confine[d] to the bathroom three or four times in the morning."[6]  (Id.)

When questioned as to why plaintiff feels she can not go back to doing secretarial work, plaintiff stated:

> I don't think that I can handle the stress of what's going on with my body, and working in an office.  Sometimes I would have to be late because I'm stuck in the bathroom, and I just don't want to take that chance and wind up being fired some place.

(Id. at 669)  Plaintiff stated that her fistula "is not any different" symptomatically since she stopped working and that the fistula is "the same as if [she] would be working."  (Id. at 670) In plaintiff's words, "[b]eing home, of course, allows me to take

_____

[5]Plaintiff testified that "maybe 17, 18 of the days are good."  (D.I. 5 at 664)

[6]Further, plaintiff stated that "the more [she] get[s] upset, the more [her] chances are of having bowel movements. It's not something I can say, okay, I've gone to the bathroom twice and I'm done.  It just doesn't work that way."  (D.I. 5 at 669)

care of it better than if I was employed and have to go into an employee bathroom or something like that. But everything's the same." (Id. at 671) Plaintiff stated that her back pain would prevent her ability to return to work because "if [she] had to get down to pick up any files or anything like that that was on the floor [she] would be stuck, unless [she] had something close by to pull [her]self up with." (Id. at 671)

## D. Vocational Evidence

During the administrative hearing, the ALJ called a vocational expert ("VE"), Arthur M. Brown, to testify, and asked him the following hypothetical question:

> I'd like for you to assume, Mr. Brown, a person who is 60 years of age on her onset date, has a 12th grade plus a year of college, suffering from various ailments. She has some degenerative disk disease. She has a fistula that's longstanding, diagnosed in 1995. She has a hearing deficiency, but she seems to hear all right. She has some obesity, indicates she weighs some 200 pounds. And we need jobs that allow her to sit/stand probably, Mr. Brown, every 30 minutes or so, i[f] [sic] she needed it for 5 minutes. And avoid temperature and humidity extremes. Ready access to a bathroom. Would be able to do sedentary and light work activities. With those limitations I want to ask you whether she could do any of her past relevant work.

(Id. at 672-73) Brown testified that plaintiff's past relevant work of a court clerk and customer service representative, both semiskilled positions, "would fall in line with [this] hypothetical" because

> [m]ost sedentary jobs by their very nature permits sitting and standing throughout the course of the day within normal time frames as long as one does not – as long as it doesn't interfere with the ability to perform the job or to complete

10

tasks.  So a person who would be sitting at a desk could
certainly stand and continue working, and sit back down.
And as I said, a customer service representative would be
light, and would be sitting and standing also.  So that
would also be closely related to it.

(Id.)  Brown noted that plaintiff's description of her customer

service job as "sitting down and primarily working in a sedentary

mode" conflicted with the Dictionary of Occupational Titles,

which described "a customer service representative in a financial

institute as light."  (Id. at 673-74)

     Plaintiff's attorney asked Brown, "if someone had to take a

number of unscheduled breaks, say perhaps every hour lasting

about 30, 30 to 45 minutes, how would that impact the person's

ability to do those jobs?"  (Id. at 674)  Brown stated that

"[s]uch a person would be unable to maintain competitive

employment on s sustained basis" since "the person would be

missing over 2 ½ hours of work.  And that would exceed normal

work tolerances."  (Id. at 674-75)  Plaintiff's attorney also

asked Brown about the impact of a person taking "three to four

unscheduled breaks lasting about 15 to 30 minutes throughout the

day."  (Id. at 675)  Brown stated that if "a person would miss an

hour a day on an unscheduled basis, [this] would exceed normal

work tolerances on a sustained basis."  (Id.)

     Finally, plaintiff's attorney posed a hypothetical of an

individual who:  (1) experiences "pain or other symptoms severe

enough to interfere with attention and concentration frequently;"

11

(2) is capable of low stress jobs;[7] (3) can only sit, stand, or walk less than two hours per day; (4) is required to shift positions at will; (5) could only occasionally lift and carry less than ten pounds; (6) has limitations with reaching, handling, and fingering; (7) can not reach overhead; and (8) would be absent more than four days per month.  (Id. at 675-76) Brown testified that "[s]uch a person would be unable to perform past work as described by the Dictionary of Occupational Titles," because: (1) the person would only be able to work four hours out of an eight-hour workday, resulting in a 50 percent loss of productivity; and (2) "low stress jobs are usually considered unskilled positions and [plaintiff's] past work was semiskilled by description."  (Id. at 676)

## E.  Medical Evidence

### 1.  Fistula

Plaintiff's anal fistula developed as the result of excision surgery on a Bartholin's gland abscess in 1998.[8]  (Id. at 154, 247)  The most pertinent facts relating to plaintiff's fistula

---

[7]The record indicates that plaintiff's attorney's question included that plaintiff is "incapable of low stress jobs," however this appears to be in error based upon the other evidence and arguments of record regarding plaintiff's condition.  (D.I. 5 at 675)

[8]A Bartholin's gland abscess is "an abscess of one of the two small compound mucus glands located one in each of the lateral wall[s] of the vestibule of the vagina, by an acute inflammatory process."  (D.I. 7 at 5, n.3)

12

condition are summarized below.

Plaintiff underwent a first surgery to repair her fistula on January 29, 1999 with Dr. Abdel-Misih of Christiana Hospital. (Id. at 148-49)  Dr. Abdel-Misih performed a second surgery to repair plaintiff's fistula on July 8, 1999.  (Id. at 145-46) Plaintiff's symptoms of diarrhea and discharge from the fistula persisted after the July 1999 surgery.  (Id. at 156-57) Plaintiff underwent a third surgery to repair the fistula with Dr. Frederick J. Denstman of Christiana Hospital on January 7, 2000.  (Id. at 166)

Plaintiff consulted with Dr. Susan Gearhart of Johns Hopkins University on February 11, 2003, and complained of persistent drainage from the fistula.  (Id. at 247)  Dr. Gearhart performed sphincteroplasty surgery on plaintiff on July 3, 2003.  (Id. at 180)  Following this most recent surgery, Dr. Gearhart noted on July 22, 2003 that plaintiff developed an abscess and began having drainage through the surgical incision site.  (Id. at 245) In August 2003, Dr. Gearhart noted that drainage was still occurring, but that both plaintiff's drainage and pain "has decreased tremendously."  (Id. at 241, 243)  Dr. Gearhart further noted in September 2003 that plaintiff continued to report drainage and "some stool drainage and some bleeding."  (Id. at 239)  In November of 2003, Dr. Gearhart noted that plaintiff's sphincteroplasty repair had broken down, and that surgical repair

13

was recommended.[9]  (Id. at 237)

## 2. Degenerative Disc Disease and Leg Pain

Plaintiff has had several treating physicians for back and leg pain;[10] the most pertinent facts relating to such condition are summarized below.

Since 2000, plaintiff has treated with Dr. Elva Delport, a rehabilitation and physical medicine specialist with the Christiana Spine Center.  In February 2000, Dr. Delport diagnosed plaintiff with a left C7 radiculopathy.[11]  (Id. at 204)  Dr. Delport noted on March 3, 2000 that plaintiff's left C7 radiculitis was "symptomatically improved."  (Id. at 202)

Plaintiff was involved in a motor vehicle accident on October 19, 2001 in which her vehicle was rear-ended.  (Id. at

_____

[9]The record does not appear to contain evidence that plaintiff underwent any additional surgeries for these symptoms, and the parties have not pointed to any.

[10]The record contains voluminous office records from Drs. Elva Delport, Kristina Hollstein, Gregory Adams, and Emmanuel DeVotta.  (D.I. 5 at 170-78, 251-531, 552-55, 579-601, 608-12)

[11]The term "radiculopathy" is commonly used to specifically describe pain, and other symptoms like numbness, tingling, and weakness in the arms or legs caused by a problem with your nerve roots, which may be caused by degenerative changes in the spine. See http://www.back.com/symptoms-radiculopathy.html.

Dr. Delport's notes indicate that plaintiff was scheduled for a transforaminal epidural injection on or about February 17, 2000, however, the records do not appear to indicate whether plaintiff actually received this injection.  (204)  An epidural injection is a steroid injection which is commonly used to treat spinal nerve irritation that is caused by tissues next to the nerve pressing against it.  See http://www.medicinenet.com ("epidural steroid injection").

14

174)   Plaintiff subsequently developed neck and back pain, and treated with Dr. Kristina Hollstein, D.C. from 2001 to 2002. (Id. at 173-76)   A December 12, 2001 MRI evidenced that plaintiff had "some slight discogenic endplate changes at L4-L5," slight annular bulging at L2-L3 and L4-L5, resulting in a "mild degree" of stenosis at L4-L5,[12] "some slight facet and ligamentous hypertrophy" at L3-L4, and "prominent facet and ligamentous hypertrophy" at L5-S1.   (Id. at 177)

Dr. Hollstein issued a permanency opinion on November 12, 2002, in which she provided the following diagnoses for plaintiff: (1) lumbar disc lesion with lumbar neuritis and left L5 radiculitis;[13] (2) cervical, thoratic, and lumbar sprain/strain; and (3) cervical and thoratic neuritis.   (Id. at 175)   Dr. Hollstein also noted that plaintiff's lower back "is continuing to give her significant pain with some left leg giving way."   (Id.)   Dr. Hollstein opined that plaintiff has a permanent injury to the lumbar spine and left lower extremity, further

---

[12]A stenosis is a narrowing of the spaces in the spine, resulting in compression of nerve roots or spinal cord by bony spurs or soft tissues (such as disks) in the spinal canal. Stenosis may occur in the lumbar section of the spine (in the low back), cervical spine (in the neck) or in the thoratic spine (in the upper back).   See http://www.medicinenet.com ("definition of spinal stenosis").   Lumbar spinal stenosis may occur in association with degenerative processes, or as a result of a congenital anomaly or trauma, or disease of the bone.   20 C.F.R. § 404, subpt. K, app. 1 (1999)("Disorders of the spine").

[13]An EMG taken on December 20, 2001 was also consistent with left L5 radiculitis.   (D.I. 5 at 170)

15

noting that "[i]t is likely that her condition will deteriorate over time with this particular injury and may even require surgical intervention.  This particular injury is also prone to long-term exacerbations and flare-ups of increased pain."  (Id.) Further, Dr. Hollstein noted that plaintiff experienced "significant flare-up of her low back area necessitating additional more aggressive treatment to include spinal injections . . . this lumbar area will most likely deteriorate with time and surgical intervention may be necessary in the future."  (Id. at 176)

Plaintiff was reevaluated by Dr. Delport in December of 2002, at which time plaintiff told Dr. Delport that she was involved in a rear-end motor vehicle collision in September of 2002.  (Id. at 201)  At this time, plaintiff complained of pain in her lower back and pain, burning and numbness in her left leg and buttock.[14]  (Id.)  Upon examination, Dr. Delport noted that plaintiff had "full range of motion in her lumbar spine with aggravation of symptoms as she goes into lumbar extension." (Id.)  Dr. Delport found that plaintiff had a "lumbar facet OA

---

[14]An EMG taken in 2004 revealed meralgia paresthetica of the left lower extremity, or left leg.  (D.I. 5 at 599)  Meralgia paresthetica is a condition which can cause burning pain, numbness or aching in the thigh or buttocks, and is caused by the compression of the lateral femoral cutaneous nerve.  The condition is often caused by restrictive clothing or weight gain. See http://www.aaos.org ("burning thigh pain (Meralgia paresthetica)").

with aggravation," and lumbar stenosis. (Id.) Plaintiff received epidural injections on January 24, 2003. (Id. at 199)

On February 26, 2003, Dr. Delport noted that plaintiff has "subarticular narrowing at L4-5 with symptomatic stenosis," and again recommended epidural injections, which plaintiff received on March 4, 2003.[15] (Id. at 198, 196) On March 24, 2003, plaintiff told Dr. Delport that the burning in her left leg had completely stopped. (Id. at 195) Dr. Delport noted on that day that plaintiff's "lumbar spine dysfunction" had "improved symptomatically." (Id.)

On May 22, 2003, Dr. Delport examined plaintiff and noted that she had "an objective decreased girth in her left thigh with the left being 49.5 cm in diameter and the right being 52 cm." (Id. at 191) Dr. Delport noted that plaintiff had a "left L3 radiculopathy." (Id.) A MRI done on May 30, 2003 at the request of Dr. Delport demonstrated evidence of "degenerative disc disease and degenerative facet disease," and multiple disc protrusions, some of which were "causing minimal narrowing of right lateral nerve root access at L4-L5 level."[16] (Id. at 190)

On June 6, 2003, Dr. Delport diagnosed plaintiff with

---

[15]Dr. Delport's March 4, 2003 procedure notes state that plaintiff's pre-operative diagnosis was "lumbar disc derangement." (D.I. 5 at 196)

[16]These findings were reported by Dr. Muhammad I. Haq of Diagnostic Imaging Associates, P.A. (D.I. 5 at 190)

17

"cervical disc derangement," and a subsequent MRI demonstrated evidence of "cervical spondylosis and disc degenerative changes . . . with left sided spurs and disc protrusions at C6-C7 greater than C5-C6."[17]   (Id. at 189, 186)   On June 20, 2003, Dr. Delport noted that plaintiff's cervical disc derangement had improved symptomatically.   (Id. at 184)   On August 22, 2003, Dr. Delport noted that plaintiff's lumbar disc derangement was "remaining mildly symptomatic."   (Id. at 183)   Plaintiff was prescribed pain medication and functional rehabilitation in September 2003.   (Id. at 601)

A MRI of plaintiff's lumbar spine taken October 17, 2003 revealed "[n]o disc protrusion, spinal stenosis or neural foraminal stenosis."[18]   (Id. at 497)   The October 2003 MRI did reveal that "desiccation of the L2-3, L3-4, and L4-5 disc material is present along with mild narrowing of the disc spaces."   (Id.)

In December 2003, plaintiff was evaluated by Dr. Yakov Koyfman of the Delaware Neurosurgical Group.   (Id. at 233)   Dr.

---

[17]Cervical spondylosis is the degeneration of the disc spaces between the vertebrae in the neck, and is commonly associated with osteoarthritis.   See http://www.medicinenet.com ("definition of spondylosis").

[18]These findings were reported by Dr. Michael Leviton. (D.I. 5 at 497)   It is not clear from the record which doctor ordered the October 2003 MRI.   (Id.)

18

Koyfman recommended a lumbar and cervical myelogram test,[19] which
was performed on January 21, 2004.  (Id. at 234, 232)  The
myelogram showed "no significant spinal stenosis" in the cervical
or lumbar spines.  (Id. at 225-26)  Dr. Koyfman's impressions
upon review of the myelogram results were that plaintiff had
"mild degenerative changes" in her neck and back, and disc bulge
at L2-L3 and L3-L4 in her back "without significant compromise of
the spinal canal or neuroforamina."  (Id. at 226-27)

On January 13, 2004, Dr. Yong K. Kim performed a disability
evaluation of plaintiff on behalf of Disability Determinations
Services.  (Id. at 205)  During that evaluation, plaintiff
attributed the onset of her low back pain and neck pain to a
motor vehicle accident in September of 2000, and rated her low
back pain as a 4-6 on a scale of 1-10.  (Id.)  Dr. Kim noted that
plaintiff had "total deafness" in her right ear, but no deafness
in her left ear.  (Id. at 206)  Plaintiff weighed 211 lbs.  (Id.)

Upon examination, Dr. Kim found that plaintiff had: "(1)
small disc protrusion[s] at L3-4 and L4-5 by MRI with (L)
radicular symptoms; (2) degenerative changes of [the] cervical
spine by MRI; (3) disc protrusion at C5-6 and C6-7 by MRI; and

---

[19]A myelogram is a specialized x-ray of the spine in which
radiopaque dye is injected into the spinal canal to illuminate a
clear outline of the spinal cord and nerve roots.  See
http://www.spinalinjuryfoundation.org/101_new/ct-myelo.htm.

19

(4) total deafness of <sup>®</sup> ear."[20]  (Id.)

Dr. Kim noted that plaintiff had a normal range of motion in her neck "except for bilateral rotation which was limited to 40 degrees," and that plaintiff's lumbar motion was limited to 70 degrees (out of 90 degrees) of forward bending.  (Id.)  Plaintiff was able to walk on her toes and heels, and had no muscle atrophy in her legs, however, had a low hand grip strength.  (Id.)  Based on his examination, Dr. Kim concluded that plaintiff's

> [w]alking and standing will be limited to 4-6 hours during an 8 hour day due to neck pain and low back pain.  Sitting will be limited to 6 hours during an 8 hour day due to neck pain and low back pain.  Lifting will be limited to 20 lbs. due to neck pain and low back pain.[21]

(Id. at 207)

There are two additional state agency evaluations of record. On January 21, 2004, state agency physicians concluded that plaintiff could occasionally lift less than 20 lbs., frequently

---

[20]It is not clear which MRI or MRIs Dr. Kim was referring to.  On August 22, 2003, Dr. Delport noted that "[o]n review of [plaintiff's] MRI scan, there are small disc protrusions seen at L3-4 and L4-5."  (D.I. 5 at 183)  A MRI taken on June 13, 2003 detailed the disc protrusions in plaintiff's cervical spine. (Id. at 186)  An October 2002 MRI and December 2001 MRI both detail slight disc protrusions in plaintiff's back.  (Id. at 172, 177)  The parties have not addressed the issue.

[21]Dr. Kim's conclusion is consistent with Physical Residual Functional Capacity Assessment forms in the record which recites the same limitations and, in addition, specified that plaintiff could "occasionally" carry 20 lbs. but could "frequently" carry 10 lbs., and had no additional limits for pushing or pulling motions.  (D.I. 5 at 37-38)  The Assessments were completed in January and June 2004.  (Id. at 37-38, 213-20, 22)

lift less then ten lbs., stand and walk ("with normal breaks")
for 6 hours per 8-hour workday, and sit ("with normal breaks")
for 6 hours per 8-hour workday.  (Id. at 35, 38)  Plaintiff was
given no limitations on pushing and pulling motions, and was
deemed capable of a variety of postural movements on an
"occasional" basis, such as kneeling and climbing stairs.  (Id.
at 30)  Each of these limitations were also noted by a state
agency examiner on May 20, 2004.  (Id. at 36, 214)  At that time,
it was also recommended that plaintiff's ability to reach
overhead is "limited," and plaintiff has a maximum residual
functional capacity ("RFC") for "light activity."  (Id. at 216,
221)  The January 21, 2004 evaluation contained no limitation on
noise, while the May 20, 2004 evaluation stated that plaintiff
should avoid "even moderate exposure" to noise to protect her
remaining hearing.  (Id. at 41, 217)

    Plaintiff underwent a myelogram of her cervical and lumbar
spine on January 21, 2004 at the request of Dr. Koyfman.  (Id. at
541-43)  The myelogram revealed "[n]o significant cervical
stenosis" and "[n]o significant spinal stenosis."  (Id. at 542-
43)  The myelogram indicated "mild degenerative changes" in
plaintiff's neck and disc bulges in her back.[22]  (Id.)

    Plaintiff received epidural injunctions from Dr. Delport on

_____

    [22]These conclusions were made by radiologist Kiang Liu, M.D.
(D.I. 5 at 543)

21

January 24, March 24, and August 3, 2004. (Id. at 585-86, 588-
89, 596) During this time, plaintiff consulted for pain
management with Dr. Emmanual DeVotta of Brandywine Pain
Management, who provided cervical facet joint blocks on February
11, 2004 and a lumbar epidural block on April 27, 2004. (Id. at
515, 527) A CT scan taken January 21, 2004 "showed diffuse
degenerative changes" and bilateral neural foraminal narrowing at
the C5-C6 and L4-L5 levels.[23] (Id. at 224) Dr. DeVotta's
February 11, 2004 report indicates that scans of plaintiff's
cervical and lumbar spines revealed mild degenerative changes.
(Id. at 525) Dr. DeVotta's impression from this CT scan was that
plaintiff has "mild degenerative changes," as well as cervical
facet joint syndrome, lumbar facet joint syndrome and lumbar
radiculopathy. (Id.)

On October 21, 2004, Dr. Delport completed a Physical
Residual Functional Capacity Questionnaire in which he diagnosed
plaintiff with: (1) cervical stenosis and C7 radiculopathy; (2)
lumbar stenosis and facet arthritis; and (3) nerve rest
paresthesia. (Id. at 552) Dr. Delport estimated that if
plaintiff were placed in a "competitive work situation," she
would not be able to walk in excess of one city block, stand for
more than 10 minutes at one time, sit for more than 15 minutes at

_____

[23]This finding was reported by Dr. Yakov U. Koyfman of the
Delaware Neurosurgical Group, P.A. (D.I. 5 at 224)

22

one time, or either sit or stand and walk in excess of two hours per day. (Id. at 554)

## III.  STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g) (2002); 5 U.S.C. § 706(e)(E) (1999); see Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). As the Supreme Court has held,

"[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established . . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)).

The Supreme Court also has embraced this as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R. Civ. P. 56:

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor or either party.

Petitioners suggest, and we agree, that this standard

mirrors the standard for a directed verdict under Federal
Rule of Civil Procedure 50(a), which is that the trial judge
must direct a verdict if, under the governing law, there can
be but one reasonable conclusion as to the verdict.   If
reasonable minds could differ as to the import of the
evidence, however, a verdict should not be directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)

(internal citations omitted).  Thus, in the context of judicial

review under § 405(g),

[a] single piece of evidence will not satisfy the
substantiality test if the [Commissioner] ignores, or
fails to resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it is
overwhelmed by other evidence-particularly certain
types of evidence (e.g., that offered by treating
physicians)-or if it really constitutes not evidence
but mere conclusion.

Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting

Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for

example, the countervailing evidence consists primarily of the

claimant's subjective complaints of disabling pain, the ALJ "must

consider the subjective pain and specify his reasons for

rejecting these claims and support his conclusion with medical

evidence in the record."  Matullo v. Bowen, 926 F.2d 240, 245 (3d

Cir. 1990).

## IV.   DISCUSSION

### A.   Regulatory Framework

Social Security Administration regulations incorporate a

sequential evaluation process for determining whether a claimant

is under a disability.  20 C.F.R. § 404.1520.  The ALJ first

considers whether the claimant is currently engaged in substantial gainful activity. If she is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's lone discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings

25

and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B.  The ALJ's Findings

In the case at bar, the ALJ found that plaintiff's fistula and hearing loss are not severe impairments at step two. (D.I. 5 at 20)  The ALJ also found, presumably at step three, that plaintiff's degenerative disc disease is "'severe' within the meaning of the Regulations but not 'severe' enough" to meet or medically equal an impairment listed in Appendix 1.[24]  Despite these conclusions, the ALJ proceeded to analyze whether plaintiff

---

[24]The ALJ stated that "[n]o treating or examining physician has mentioned findings, either singularly or in combination, equivalent in severity to the criteria for any listed impairment," and also relied upon the failure of any state agency medical consultants to find that any medical listing was met or equaled in support for his conclusion.  (D.I. 5 at 20)  With respect to plaintiff's degenerative disc disease, plaintiff argues that the ALJ improperly discounted the opinion of Dr. Delport regarding plaintiff's functional limitations, which is at issue in step five.  (D.I. 7 at 10-15)

26

had the residual functional capacity to perform her past relevant
work at step four.  See 20 C.F.R. § 404.1523 ("[W]e will consider
the combined effect of all of your impairments without regard to
whether such impairment, if considered separately, would be of
sufficient severity").  The ALJ concluded that plaintiff is not
disabled because, in the view of the vocational expert, she can
perform her past relevant work as a court clerk or customer
service representative.  (D.I. 5 at 23)

## C. Analysis of the ALJ's Decision at Step Two

At step two, the ALJ must determine whether a claimant, who
is not currently performing substantial gainful work, is
suffering from a severe impairment.  If the claimant fails to
show that her impairments are "severe," she is ineligible for
disability benefits.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d
Cir. 1999).  The Regulations provide that a "severe" impairment
is an "impairment or combination of impairments which
significantly limits your physical or mental ability to do basic
work activities."  20 C.F.R. § 404.1520.  In the case at bar,
plaintiff challenges the ALJ's finding that her fistula and
hearing loss are not "severe" impairments.[25]  (D.I. 7 at 16-20)

### 1. Fistula

The ALJ noted that plaintiff

---

[25]Plaintiff does not argue that the ALJ erred in finding
that plaintiff's degenerative disc disease is not "severe" enough
to meet or medically equal a listed impairment.

27

suffers from an anal fistula. She has undergone four
separate surgeries to repair the fistula, in 1998 (Exhibit
3F), 2000 (Exhibit 5F), and 2003 (10F). Despite this
surgery, she still experiences unpredictable bowel
movements, bleeding, severe burning pain, intestinal fluid
leakage and diarrhea. The claimant continued to work while
suffering from this impairment, and there is no evidence
that it currently limits her ability to do basic work
activities. The undersigned therefore finds that claimant's
anal fistula is not a severe impairment, though her symptoms
will be considered in formulating her residual functional
capacity.

(D.I. 5 at 20)

Plaintiff argues that the ALJ's determination that her

fistula is not severe is not based on substantial evidence.

(D.I. 7 at 18-19) Specifically, plaintiff asserts that several

pieces of evidence demonstrate the severity of her fistula

condition, namely: (1) "the last two years that [she] worked

were terrible;"[26]  (2) plaintiff feels she will likely be fired

from employment due to her body's schedule;[27] (3) plaintiff has

had five[28] unsuccessful invasive surgeries to repair her fistula;

---

[26]The ALJ found the plaintiff's allegations regarding her
pain and limitations "generally credible in light of the medical
evidence of record." (D.I. 5 at 21)

[27]Plaintiff asserts, as per her hearing testimony, that she
"always wind[s] up getting sick before [she leaves] the house,
because [she] was such a nervous wreck that [she] wouldn't make
it to work on time if [she] had a bowel movement." (D.I. 7 at
18, citing D.I. 5 at 659) Plaintiff further testified that she
must wait four hours in the morning prior to leaving her home,
and is confined to the bathroom on bad days. (D.I. 5 at 658,
664)

[28]Plaintiff lists an additional surgery in 1999 not noted by
the ALJ. (D.I. 7 at 18)

28

(4) plaintiff complained of diarrhea, swelling, bowel drainage, and pain throughout her course of treatment with Dr. Gearhart (February 2003 - March 2004), and still has problems relating to the condition.[29]  (Id. at 18)  Thus, plaintiff asserts "it is apparent that [her] anal fistula limits her ability to do basic work activities more than just the need to be near a bathroom." (Id. at 19)

In response, defendant argues that, even if plaintiff's work experience during 2002 and 2003 was subjectively "terrible," "plaintiff's multiple surgeries did not prevent her from performing her past work in 2002 and 2003."  (D.I. 10 at 11) Further, plaintiff testified that in November 2004, her fistula was "the same as if [she] were working," but that it was easier to cope with from home.  (D.I. 10 at 11, citing D.I. 5 at 670-71)

Undoubtedly, plaintiff's condition is painful and discomforting.  Plaintiff asserts that the pain, diarrhea and bleeding "certainly imposes more than a minimal effect on her functioning."  (D.I. 7 at 19)  However, plaintiff has not pointed to any evidence of record which describes how her symptoms affect

---

[29]Plaintiff suggests that Social Security previously deemed the fistula condition as severe in January 2004 and March 2004. (D.I. 7 at 18, citing D.I. 5 at 36-37, 220)  The record does not support plaintiff's suggestion and, in any event, such a determination would not necessarily be binding or persuasive at this time.  See 20 C.F.R. § 404.1520(c)("it is possible for you to have a period of disability for a time in the past though you do not now have a severe impairment").

29

her ability to perform basic work activities, such as, by general
example, walking, sitting, typing, movement of files, talking on
a telephone, or writing.[30]   The evidence of record indicates that
plaintiff sustained gainful employment during and after at least
three fistula surgeries in 1999 and 2000, during which time
plaintiff presumptively completed basic work activities.
Plaintiff admittedly is not working now due to a fear that she
would lose her job for unexcused absenteeism, not any actual
difficulties encountered completing basic work activities.

## 2.  Hearing loss

With respect to plaintiff's hearing loss, the ALJ succinctly
stated:

> There is also no evidence as to the vocational or functional
> effects of the claimant's hearing loss.  Accordingly, the
> undersigned finds that this is not a severe impairment.

(D.I. 5 at 20)   Plaintiff argues that this finding is not based
on substantial evidence.   (D.I. 7 at 19-20)

Plaintiff testified that her hearing is interfered with by

_____

[30]The question of how plaintiff's fistula affects her
ability to perform basic tasks is different from how plaintiff's
fistula affects her workplace attendance, such as unexcused
breaks and absences.   The latter inquiry is addressed as part of
plaintiff's residual functional capacity.   Compare White v.
Barnhart, 340 F.Supp.2d 1283, 1288-89 (N.D. Ala. 2004) (holding
that Commissioner erred as a matter of law, where a RFC
assessment did not take into account vocational expert's opinion
that plaintiff required excessive bathroom breaks, stating that
"RFC assessments must consider maximum remaining ability to do
sustained work activities in an ordinary work setting on a
regular and continuing basis . . . 8 hours a day, for 5 days a
week").

background noise and she does better when looking at the
individual speaking. (D.I. 5 at 665) The remainder of
plaintiff's argument that her "hearing loss would affect her
functioning as well as her ability to work" is based upon a
questionnaire filled out by a non-examining state agency
physician, in which it was recommended that plaintiff should
avoid "moderate exposure" to noise to protect her remaining
hearing. (D.I. 7 at 20, citing D.I. 5 at 217) In response,
defendant notes that "[p]laintiff testified that she was required
to wear an earpiece when working as a customer service
representative, but she did not identify any hearing-related
difficulty when working as a court case processor." (D.I. 10 at
11, citing D.I. 5 at 657)

There is no dispute that plaintiff is deaf in one ear.[31]
(D.I. 5 at 206) There does not appear to be any medical evidence
of record regarding the hearing capacity in plaintiff's other
ear, and plaintiff has pointed to none.

Plaintiff testified that she "made it through boot camp on
the Marine Corps" with one deaf ear, and previously worked in
customer service using an earpiece. (Id. at 657) Indeed,
plaintiff was able to testify at the hearing without assistance.

---

[31]Plaintiff's medical records indicate that she is deaf in
her right ear, however, plaintiff testified that she is deaf in
her left ear and has lost more than half her hearing in her right
ear. (D.I. 5 at 206, 653)

31

As defendant has indicated, there does not appear to be any
evidence of record regarding any hearing-related difficulties
encountered by plaintiff while working as a court clerk.
Plaintiff simply avers that her hearing loss impairment "places
more than a minimal effect on her functioning," without further
evidence.  (D.I. 7 at 20)

### 3.  Conclusion

The ALJ buttressed his conclusion that plaintiff's fistula
and hearing loss conditions do not meet the requisite level of
severity with evidence that plaintiff has, in the past, held
employment while suffering from these conditions.  Plaintiff has
pointed to no evidence that tends to demonstrate that she cannot
complete basic work activities; likewise, there is no conflict
created by countervailing evidence in this regard.  On this
record, the court finds that the Commissioner's decision is
supported by substantial evidence.

### D.  Analysis of the ALJ's Decision at Step Four

The next task for the court is to determine whether the
ALJ's determination that plaintiff retains the RFC to perform her
past jobs was supported by substantial evidence.  Plaintiff
generally alleges that "the ALJ failed to consider the combined
effects of her impairments on her ability to perform her past
relevant work, pursuant to 20 C.F.R. § 404.1545."  (D.I. 7 at 23)
As part of the RFC analysis, "the ALJ must consider the combined

32

effects of multiple impairments, regardless of severity."
Burnett v. Apfel, 220 F.3d 112, 122 (3d Cir. 2000). Likewise,
the testimony of a VE may only be considered for purposes of
determining disability if the hypothetical question posed by the
ALJ accurately portrays plaintiff's RFC. See Ashby v. Barnhart,
No. Civ. A. 02-1465, 2003 WL 22245142, *7 (E.D. Pa. June 11,
2003) (citing Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994)).

In this case, the hypothetical question to the VE included
plaintiff's age and education,[32] and additionally: "some
degenerative disc disease," a longstanding fistula, a "hearing
deficiency, but [plaintiff] seems to hear all right," some
obesity, a sit/stand option every 30 minutes for 5 minutes, no
temperature or humidity extremes, and "ready access to a
bathroom." (D.I. 5 at 672-73) Plaintiff argues that this
question was deficient in several regards: (1) it did not
include the more stringent functional limitations of Dr.
Delport's opinion; (2) it failed to include all of the functional
limitations flowing from plaintiff's fistula and hearing loss
impairments; (3) it failed to include several limitations set
forth by a state agency official, such as "limited overhead
reaching," "limited hearing," and restrictions to avoid "even
moderate exposure" to noise or concentrated exposure to hazards;

---

[32]Plaintiff was 60 years old at onset and has a high school
education plus one year of college. (D.I. 5 at 672-73)

33

and (4) it failed to take into account Dr. Delport's opinion that
plaintiff needs to take "unscheduled breaks during an 8 hour
working day" and will be absent more than four times per month.
(D.I. 7 at 27-28)  Plaintiff also asserts that the ALJ's reliance
on the VE's testimony in this case was in error, because the VE's
testimony is invalid.  (Id. at 25)  These issues will be
addressed in turn.

### 1.  The ALJ's determination that Dr. Delport's opinion was not controlling

The vocational expert testified that, if Dr. Delport's RFC
assessment were applied to the hypothetical person question,
there would be no jobs, including plaintiff's past relevant work,
that plaintiff could perform.  (D.I. 5 at 676)  Plaintiff,
therefore, seeks to establish that the ALJ erred in not accepting
Dr. Delport's opinion as controlling.  (D.I. 7 at 27)

Dr. Delport has opined that plaintiff maintains the
following RFC:  (1) she is limited to sitting continuously for
only 15 minutes at a time and standing continuously for 10
minutes at a time; (2) she is limited to sitting, standing and
walking for less than two hours per 8 hour workday; (3) she needs
unscheduled breaks during the workday; (4) she can lift less than
10 pounds occasionally; (5) she is significantly "limited in
reaching, handling and fingering and can only use her left hand
10% of the time, right hand 50% of the time, fingers 50% of the
time, and her arms 0% of the time; and (6) she would likely be

34

absent more than four times per month.  (D.I. 7 at 11)

The ALJ stated:

This opinion, suggesting a residual functional capacity for less than sedentary work, is not supported by the objective findings or the degree of treatment.  The most recent MRI report indicates that there is no spinal stenosis (Exhibit 23F),[33] and there is no other evidence to support Dr. Delport's limited functional capacity.  The undersigned finds that because Dr. Delport's opinion is not consistent with the other evidence of record and is not well-supported by the medical evidence, it will not be given controlling weight.  Her assessment of the claimant's abilities has been taken into consideration in determining the claimant's residual functional capacity.

(D.I. 5 at 22)

Dr. Delport's opinion is supported, plaintiff argues, by medical evidence which "reveals the progression of [plaintiff's] degenerative disc disease," and further by objective findings, including spinal stenosis evidenced by the May and October 2003 MRIs.  (D.I. 7 at 13-14)  Plaintiff asserts that she received a degree of treatment for flare-ups of pain (epidural injections, pain medications, physical therapy, and the cervical joint and lumbar epidural blocks given by Dr. DeVotta in 2004) consistent with Dr. Delport's restrictions.  (Id. at 14-15)  Finally, plaintiff argues that Dr. Delport's restrictions are supported by Dr. Hollstein's opinion that plaintiff's back injury is permanent, and her condition "will likely deteriorate over time," even possibly "requir[ing] surgical intervention."  (Id. at 15)

---

[33]Exhibit 23F corresponds to the January 21, 2004 myelogram of plaintiff's cervical and lumbar spine.  (D.I. 5 at 543)

In response, the Commissioner asserts that Dr. Delport's opinion was contradicted by Dr. Kim's assessment of plaintiff's ability to work, as well as January and May 2004 state agency evaluations, and the ALJ, therefore, was entitled to discount it. (D.I. 10 at 8-9)  With respect to Dr. Hollstein's opinion, defendant argues that "a chiropractor is not qualified to offer an opinion as to a Social Security claimant's remaining ability to work."[34]  (Id. at 9, citing Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999))

The court agrees that Dr. Delport's opinion conflicts with the evidence of record.  For instance, plaintiff's January 21, 2004 myelogram result indicated no spinal stenosis,[35] a result directly contradictory to Dr. Delport's October 12, 2004 diagnoses of cervical and lumbar spinal stenosis.  (D.I. 5 at 22,

---

[34]Although a chiropractor's opinion is not "an acceptable medical source entitled to controlling weight" pursuant to 20 C.F.R. § 416.913, "a hearing examiner can **consider** a chiropractor's opinion . . . insofar as it is deemed relevant to assessing a claimant's disability" according to 20 C.F.R. § 416.913(e)(3).  Hartranft, 181 F.3d at 361-62 (emphasis in original).  Dr. Hollstein's opinion does not address any functional limitations on plaintiff's remaining ability to do work.  (D.I. 5 at 175)  Dr. Hollstein's report was made in connection with plaintiff's personal injury case related to a motor vehicle accident, and is not necessarily persuasive in this context.  Compare Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984) (noting that "the ALJ could reasonably disregard so much of the physicians' reports as set forth their conclusions as to worker compensation claims").

[35]Plaintiff's January 21, 2004 myelogram revealed mild degenerative changes and "no significant" cervical or spinal stenosis.  (D.I. 5 at 542-43)

36

552)  Further, plaintiff's December 12, 2001 MRI revealed only a

"mild degree" of stenosis at that time.  (Id. at 177)  A MRI

taken on October 25, 2002 revealed mild disc desiccation and

"very mild" degenerative changes, and no stenosis was noted.

(Id. at 172)  Plaintiff's May 30, 2003 MRI also revealed

degeneration, but did not specifically note any stenosis.  (Id.

at 190)  The October 17, 2003 MRI report stated that mild

narrowing of the disc spaces was present, but "no disc protrusion

or spinal stenosis [was] seen."[36]  (Id. at 497)

The regulations provide that Dr. Delport's opinion is to be

given controlling weight only if it is "well-supported by

medically acceptable clinical and laboratory diagnostic

techniques" and "it is not inconsistent with other substantial

evidence in the record."  20 C.F.R. § 404.1527(d)(2).

The ALJ stated that Dr. Delport's opinion, "suggesting a residual

functional capacity for less than sedentary work, is not

supported by the objective findings or degree of treatment,"

insofar as the January 21, 2004 myelogram showed no spinal

stenosis, "and there is no other evidence to support Dr.

Delport's limited functional capacity."  (D.I. 5 at 22)  The ALJ

cited one of several significant pieces of medical evidence which

---

[36]Plaintiff's statement that "[u]nlike the decision's
findings, spinal stenosis was noted in the May 30, 2003 and
October 17, 2003 MRIs" does not accurately reflect the record at
bar.  (D.I. 7 at 14, citing D.I. 5 at 190, 497)

is inconsistent with Dr. Delport's opinion. (D.I. 5 at 22)
Therefore, the ALJ's decision not to adopt Dr. Delport's opinion
as controlling in this case was not in error. See 20 C.F.R. §
404.1527(d)(4) ("[g]enerally, the more consistent an opinion is
with the record as a whole, the more weight we give to that
opinion.").

### 2. The ALJ's conclusion regarding plaintiff's functional limitations

Plaintiff contends that the ALJ erred in not embracing Dr.
Delport's RFC assessment. Dr. Delport opined that plaintiff
would not be able to walk in excess of one city block, stand for
more than 10 minutes at a time, sit for more than 15 minutes at a
time, or either sit, stand, or walk in excess of two hours per
day were she to be placed in a "competitive work situation."
(Id. at 554) In contrast, Dr. Kim opined that plaintiff's pain
would cause her to be limited to sitting and standing for 4-6
hours during an eight hour workday, specifically, limited to
sitting no more than six hours. (Id. at 207) In 2004, two state
agency physicians concluded that plaintiff could stand and walk
("with normal breaks") for 6 hours per 8-hour workday, and sit
("with normal breaks") for 6 hours per 8-hour workday. (Id. at
35, 38) Plaintiff herself testified that she can walk "maybe a
couple of blocks" before experiencing pain, and can sit for
"about an hour;" both exceed Dr. Delport's limitations. (Id. at
661-62) On this record, the court declines to find that the ALJ

38

committed error in incorporating an option to sit or stand every
30 minutes for 5 minutes in his hypothetical question to the
VE.[37]

Plaintiff also argues that the ALJ failed to consider the
functional limitations flowing from her anal fistula and hearing
loss impairments in determining her RFC.  (D.I. 7 at 22)
Plaintiff has not pointed to any record evidence that her hearing
loss affects her RFC.  The ALJ did not commit error in failing to
incorporate specific deafness-related limitations into his
hypothetical question to the VE in the absence of such
evidence.[38]  The court, therefore, finds that sufficient evidence
exists to support the ALJ's conclusion that plaintiff retains the
RFC to perform her past relevant work despite any hearing loss.

With respect to plaintiff's anal fistula, the ALJ heard
plaintiff's testimony that she "still experiences unpredictable
bowel movements, bleeding, severe burning pain, intestinal fluid

---

[37]Plaintiff's argument that "[t]he hypothetical posed by the
ALJ makes **no** mention of pain" resulting from her low back and
fistula conditions is not persuasive.  (D.I. 11 at 6)   The ALJ
specifically accounted for plaintiff's subjective complaints of
pain in his consideration of her RFC.  (D.I. 5 at 21)   Plaintiff
testified that she could stand only 5-10 minutes, and sit for an
hour, before experiencing pain.  (Id.)  The hypothetical included
the "sit/stand option to permit changing positions every 30
minutes," which is not inconsistent with plaintiff's complaints
of pain.  (Id. at 22)

[38]The court declines to find that the ALJ's statement that
plaintiff "has a hearing deficiency, but she seems to hear all
right" was in error.  (D.I. 5 at 672-73)

39

leakage and diarrhea" due to her fistula. (D.I. 5 at 20)
Plaintiff testified that her bowel movements are not predictable
and are worsened by stress. (Id. at 668-69) Plaintiff also
testified that she is "confined to the bathroom three or four
times in the morning" on bad days due to irritation and bleeding.
(Id. at 664) The ALJ found that plaintiff's "allegations
regarding her pain and limitations [to be] generally credible in
light of the medical evidence of record." (Id. at 21)

    In a recent decision, the court in Pierson v. Barnhart
affirmed the decision of the Commissioner that a plaintiff with a
combination of medical impairments, including a rectovaginal
fistula, were not severe enough to meet or equal a listed
impairment, and that plaintiff was capable of sedentary work.
No. Civ. A. 03-659, 2006 WL 2009727, *3 (W.D. Va. July 18, 2006).
In Pierson, plaintiff's treating physician opined that
plaintiff's rectovaginal fistula, which required a colostomy bag,
limited the plaintiff's ability to sit, stand, or walk for more
than two hours at a time. Id. Further, plaintiff's doctor noted
that plaintiff "needed to lie down at unpredictable intervals
during a work shift and would be absent from work about three
times a month." Id. Notably, however, "Dr. Currie provided no
explanation for how a rectovaginal fistula could so limit the
plaintiff, and the balance of the record contains no supporting
medical evidence which might corroborate these limitations." Id.

40

Rather, "[t]he only evidence supporting Dr. Currie's October 2000
opinion is the plaintiff's own testimony that . . . she was
disabled by 'psychological discomfort,' or her fear that the
colostomy bag would leak . . . as well as severe fatigue." Id.
The plaintiff in that case testified that, despite her fear, her
colostomy bag never leaked, she never received treatment for
fatigue, and she was able to care for a child and attend college
full-time. Id. In view of these facts, the Pierson court stated
that the ALJ was not required to give controlling weight to the
treating physician's opinion on these issues, and affirmed the
Commissioner's final decision that plaintiff retained the ability
to do sedentary work. Id. at *3-4 ("there [was] substantial
evidence for the Law Judge to have found that the plaintiff's
assertions regarding the disabling severity of her symptoms
[were] not credible").

In the present case, neither Dr. Delport[39] nor any other
physician of record has rendered an opinion which purports to
link plaintiff's fistula, despite its unpredictability, to any
functional limitations, for example, limitations on sitting,
standing, or walking or the amount of unscheduled break time

---

[39]Dr. Delport indicated on the Physical Residual Functional
Capacity Questionnaire that plaintiff would need an unscheduled
break about every 30 minutes to an hour, lasting up to 45
minutes. (D.I. 5 at 554) This questionnaire, however, described
only plaintiff's spinal impediments and did not describe
plaintiff's fistula condition. (Id. at 552)

41

needed. Plaintiff's uncorroborated testimony regarding her functional limitations also lacks these important details. The record contains no objective medical evidence that describes the practical effects of plaintiff's fistula condition in real world terms.

The ALJ's hypothetical question to the VE included the requirement that plaintiff have "ready access to a bathroom." (Id. at 673) "Ready access," however, does not address the duration of time plaintiff undisputedly needs to be away from her desk to use such facilities, or the frequency of breaks.[40] According to the VE, if a person had to take four unscheduled breaks of 15 minutes in length during a normal workday, "a person would miss an hour a day on an unscheduled basis, which would exceed normal work tolerances." (Id. at 675) Though the record appears to contain evidence that plaintiff requires unscheduled breaks, it is unclear whether the amount of time required per day equals or exceeds one hour.

After reviewing the record, the court cannot conclude that the record contains "such relevant evidence as a reasonable mind

---

[40]Dr. Gearhart's treatment notes demonstrate that plaintiff continued to experience fluid leakage in late 2003 despite surgical repair, which was failing at that time. (Id. at 237, 239) When she was previously employed as a court clerk, plaintiff "took clothes to work if she needed to change clothes;" presumably, changing clothes consumes break time. (Id. at 659)

42

might accept as adequate to support"[41] the ALJ's determination
that plaintiff's anal fistula is a condition that can be
accommodated in a competitive work environment.  On the one hand,
the court recognizes that the fear of embarrassment or even of
job termination, alone, does not diminish a claimant's RFC.  On
the other hand, there is no evidence relating to whether an anal
fistula can be controlled through, e.g., medication, diet,
therapy or appliances, or to whether plaintiff's symptoms are as
disruptive as she characterizes them to be.

For these reasons, the court remands the case for the
purpose of reviewing plaintiff's RFC in light of the combination
of her conditions, particularly illuminating the effects of her
anal fistula on her ability to maintain her past relevant work.

### 3.  Restrictions omitted from the ALJ's hypothetical question

Plaintiff argues that the ALJ failed to consider some of the
limitations set forth by a state agency medical consultant,
namely, that plaintiff's ability to reach overhead is "limited,"
she should avoid "even moderate exposure" to noise to protect her
remaining hearing, and that she should avoid concentrated
exposure to hazards.  (D.I. 7 at 23; D.I. 5 at 216-17)  The ALJ
did not mention these findings in his opinion.  (D.I. 5 at 21-22)
However, there is no indication in the record that plaintiff's

---

[41]Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).

43

past relevant work would require more than "limited" reaching overhead, moderate exposure to noise or exposure to other hazards.[42]  (Id. at 98, 101)

## 4. Alleged conflict between the VE testimony and DOT

Plaintiff asserts that the VE's testimony is invalid in this case because it is inconsistent with the Dictionary of Occupational Titles ("DOT").  (D.I. 7 at 25, citing Social Security Ruling 00-4p, 2000 WL 1898704 (S.S.A. 2000) ("adjudicators may not rely on evidence provided by a VE . . . if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions"))  Plaintiff's argument is based upon a discrepancy between the VE's description of the court clerk job as "semi-skilled," and the DOT #243.362-010 listing the court clerk position as "skilled."  (D.I. 7 at 25-26, D.I. 5 at 672) Defendant argues that there is no inconsistency because, pursuant to Social Security Regulation 00-4p, "[t]he DOT lists the **maximum requirements** of occupations as generally performed, not the range

---

[42]With respect to both her former court clerk and customer service representative positions, plaintiff informed Social Security that the "job required [the] use of machines, tools, or equipment."  (D.I. 5 at 98, 101)  Plaintiff also stated that the court clerk "position required a lot of moving of boxes," and that the customer service representative job required standing approximately 5 ½-6 ½ hours.  (Id. at 99-100)  Plaintiff stated that both jobs involved making and answering telephone calls, and interacting with other employees, however, it is unclear whether the noises from either activity constitute "moderate" noise. (Id. at 98-101)

44

of requirements of a particular job as it is performed in
specific settings." (D.I. 10 at 12)(emphasis added)

The VE's testimony was not invalid in this case. Compare
Haas v. Barnhart, 91 Fed. Appx. 942, 948 (5th Cir. 2004) (VE's
identification of jobs at step five at the sedentary level not at
odds with Social Security Administration regulation 00-4p).
Defendant is correct that the DOT lists the maximum out of a
range of requirements for a position. See Shears v. Barnhart,
No. Civ. A. 05-3713, 2006 WL 1641635, *2 (E.D. Pa. June 9, 2006).
As there is no "conflict" between the regulations and the VE's
testimony, the ALJ was not required to address the issue in his
opinion. See Konkol v. Barnhart, 75 Fed. Appx. 529, 534 (7th
Cir. 2003) (duty under S.S.R. 00-04p "arises only if the claimant
(or his counsel) explores a discrepancy" between the VE's
testimony and the DOT).

## V. CONCLUSION

For the reasons discussed above, the court finds that the
Commissioner's decision at step two is supported by substantial
evidence of record. Because the court finds that the
Commissioner's decision at step four is not adequately supported,
the court remands the case to defendant for further proceedings,
consistent with this memorandum opinion. Plaintiff's motion for
summary judgment (D.I. 7), therefore, is granted in part and
denied in part, and defendant's motion for summary judgment (D.I.

45

9) is granted in part and denied in part.  An appropriate order

shall issue.